## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AIRBORNE MEDIA GROUP, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 15-11018 (___) |

## DECLARATION OF CORDELL R. BROWN IN SUPPORT OF
## CHAPTER 11 PETITION AND RELIEF

Cordell R. Brown, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am the Chief Executive Officer for the above-captioned debtor and debtor-in-possession (collectively, the "**Debtor**").

2.      As a result of my involvement with the Debtor, as a member of the Debtor's management team and Board of Directors, I am familiar with the Debtor's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from my personal experiences or from the Debtor's employees, professionals, or retained advisers that report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code (as defined below), the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.      On May 8, 2015 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

---

[1] The last four digits of the Debtor's tax identification number are: 8854. The Debtor's principal place of business is: 1099 Main Avenue, Suite 321, Durango, Colorado 81301.

**Code"**) in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The

Debtor continues to operate its businesses and manage its properties as a debtor-in-possession.

4.    I submit this Declaration on behalf of the Debtor in support of the

Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.    Part I of this Declaration provides an overview of the Debtor's business

and organizational structure, as well as a discussion of the events leading to the Debtor's chapter

11 filings. Part II sets forth the goals of the Debtor's chapter 11 reorganization.

## PART I

**A.    Background and History**

6.    The Debtor started in March 2011 as an idea to create systems and

networks which featured interactivity between digital displays in public and private venues with

mobile devices, such as smartphones and tablets. For example, the system and network would

permit patrons at a bar or restaurant to selectively listen to the muted live sports and other events

playing on the numerous digital displays in the venue even though the displays required that their

audio be muted for practical noise considerations.

7.    Executing on this idea, the Debtor created a smartphone application,

Audioair®, and related products (including products the Debtor manufactures for mobile device

users in many different vertical markets such as health clubs, hotels, casinos, stadiums, and other

places where digital displays are deployed). These products interact with digital displays in all

new ways, including the ability to listen into a specific display's programming at their seat

through their smartphone or tablet. The application and related technology also includes ways for

a business owner and the Debtor to monetize the customer's use of Audioair. For example, the

application permits visual advertising on a smartphone and the network's "shared screens"

2

installed on the premises, allows customers to participate in loyalty programs, sends notifications of specials and promotions, and encourages participation in social media and chat.

        8.    Since the beginning of its business, the Debtor has been developing Audioair and its related technologies, piloting the technology nationwide. Improvements in wireless technologies and the capabilities of mobile devices, the wide spread adoption of smartphones and knowledge concerning how people would use mobile devices gained in the nationwide piloting program, all of which occurred since the Debtor's start-up, enabled the Debtor to go-to-market on a systematic basis at the end of the first quarter 2015. Favorable developments with respect to the Debtor's aggressive intellectual property development program also initiated at start-up opened up new sources of licensing revenue as the company now enters the marketplace formally.

        9.    The Debtor currently employs 9 people, four of which have just joined to aid in the network rollout and has a monthly payroll of approximately $63,000.00.

Prepetition Indebtedness and Capital Structure

        10.    The Debtor has a complex and nation-wide investment structure. There are over 100 equity security holders, totaling approximately $6 million invested. The Debtor has a $250,000.00 unsecured line of credit from 1st Southwest Bank, of which $100,000.00 is currently drawn down. The Debtor also has $1 million in unsecured debt (absent the Judgment of the Petitioners (described below)) consisting mainly of contractors and information technology services and support.

        11.    In December 2012, as part of a larger investment transaction, 85.75% of the shareholders of the Debtor voted to change the Debtor from a Nevada corporation to

Delaware corporation (the "**2012 Transaction**"). In the 2012 Transaction, the founders of the Debtor contributed substantial intellectual property assets to the Debtor.

12.     By the beginning of 2015 the Debtor had won awards and recognition for its activities and had completed the exploration of the vast segmented market for its products, determined that it could obtain customers rapidly, had developed a focused go-to-market plan, commenced building an accomplished executive management team, and had learned the potential for licensing its patents. With this demonstrated value established, the Debtor was prepared to take on new capital on favorable terms that would provide the millions of dollars necessary to scale and build the brand of the company as rapidly as possible.

13.     Accordingly, with the advice of the best advisors the Debtor could secure, the Debtor began the process to obtain a minimum of $7.5 million in Series A round follow-on financing from the high tech ecosphere of funding sources for this type of business. The crux and basic terms of a Series A financing round is to negotiate the sale of a percentage of the Company with venture capitalists, angel investors, and strategic investors in return for the millions of dollars necessary to scale and build the brand of the Company.  To provide operating runway while the Series A round negotiations progressed, the Debtor was also near conclusion of the sale of a convertible debt round that had raised $1.7 million, with $1.8 million left in a $3.5 million round.

14.     With the momentum anticipated from the Series A funding, the Debtor would immediately begin exploring the need of a Series B round based on its growth and capital requirements. In fact, it is not unusual for a high-tech company to engage in multiple series of financing rounds, even at the conclusion of each round when a new implied valuation is determined. For instance, if the Debtor were able to raise $10 million in return for the sale of

thirty per cent (30%) of the Debtor in the critical Series A round, the implied value would be roughly $30 million. Each subsequent round would have diminished risk with more money invested for the sale of a smaller portion of the Debtor. A major challenge for the management team and its advisors is to create maximum value, including a clearly demonstrated increasing trajectory of revenues. Such demonstrated value will keep shareholder dilution to a minimum as portions of the Debtor are sold off.

Events Leading to Commencement of the Chapter 11 Cases.

15.    As noted above, earlier in the life of the Debtor, the Debtor incorporated itself in Delaware as part of the 2012 Transaction. Notwithstanding the clear majority approval of the 2012 Transaction, certain dissenting shareholders, some of whom were also former insiders of the Debtor (the "**Petitioners**"), expressed their displeasure with the 2012 Transaction and initiated an action in Nevada state court, under Nevada state law, to value their shares and have them liquidated by the Debtor. Throughout 2013 and 2014, the Debtor, at the advice of counsel and other professionals, offered the Petitioners what was viewed as fair value for their shares. In fact, the Debtor attempted to negotiate the fair market value of the Petitioners' stock, which by Nevada law, was set at the date of the 2012 Transaction. But I, management of the Debtor, the Debtor's advisors, and certain constituents of the Debtor could not agree to the onerous counterproposals of the Petitioners as their proposals required collateralization of the Debtor's valuable intellectual property, which was about to be formally patented.

16.    Ultimately, in December 2014, the Nevada state court agreed with the Petitioners that their shares were worth $4.25 per share, a value greater than the Debtor offered the Petitioners and far higher than the $1.00 share price of their original investment. On January 22, 2015, the Nevada state court entered a judgment in favor of the Petitioners in the amount of

$1,908,596.87 (the "**Judgment**"). The Petitioners' attorneys also have an approximate $219,000 claim against the Debtor as part of the Judgment.

17.    On February 27, 2015, the Debtor appealed the Judgment to the Supreme Court of Nevada, styled <u>Airborne Media Grp., Inc. v. Michael Chapman, et al.</u>, Case No. 67479 (Nev. Feb. 27, 2015). On March 19, 2015, the Office of the Clerk of the Supreme Court of the State of Nevada assigned the appeal to the Settlement Program, which required the parties to participate in a mediation teleconference with the settlement judge by April 18, 2015.

18.    During the appeal, I and other management contemplated proposing a reasonable settlement offer to the Petitioners as the Debtor was in a position to obtain new capital based on advancement in the valuation of our intellectual property. This new capital infusion was attractive as it did not require the collateralization of the intellectual property.

19.    Shortly before offering our proposal, however, the Petitioners proceeded against the Debtor's assets by garnishing the Debtor's bank accounts on April 10, 2015. The garnishments also froze the Debtor's access to its line of credit. The Petitioners' actions have left the Debtor with zero available liquidity.

20.    Further, the Debtor learned that a Petitioner was contacting the Debtor's long time strategic partners, where work on a major project was underway, including negotiations on IP licensing, and the Debtor's investors and creditors, with the intent to harm Debtor's business prospects and access to funding. In fact, one Petitioner told the Debtor's investors that the value of the Debtor's intellectual property was far below its actual value, intending to scare away further investment. Despite their efforts, the Debtor successfully raised over $2 million in follow-on financing since the beginning of the Petitioner's dispute to the

present. Yet the Debtor has had to make disclosure concerning this matter and it has had a direct impact on Debtor's ability to raise follow-on investment.

21.     On April 17, 2015, one day before the deadline to partake in the settlement teleconference in the Nevada appeal, the Petitioners filed an involuntary chapter 7 case against the Debtor, styled In re Airborne Media Inc., No. 15-14045 SBB (Bankr. D. Del. Apr. 17, 2015) (the "**Chapter 7 Case**"). On April 23, 2015, the Petitioners filed a notice with the Supreme Court of the Nevada stating that the Debtor's appeal of the Judgment was stayed by the Petitioner's Chapter 7 Case.

## PART II

A.     **Goals for the Chapter 11 Case**

22.     The Debtor intends to use the chapter 11 process to preserve its assets, protect its employees' jobs, and confirm a plan of reorganization proving beneficial to all stakeholders.

23.     To do this, the Debtor will continue its business as it had pre-petition. In fact, before the Petitioners filed the Chapter 7 Case against the Debtor, the Debtor was in the process of obtaining additional funding, expanding its product channels, and concluding two years of negotiation for a major license of its intellectual property.

24.     First, the Debtor has been in negotiations with three potential Series A leads and investors, and more than a dozen accredited investors for its current convertible debt round, thus obtaining additional capital investment in its business. For example, at the time of the Chapter 7 Case filing and still now, the Debtor is in the process of finalizing certain discrete steps to obtain potential Series A investments to provide go-to-market capital. Further, the

Debtor's management has reached out to its existing investors to provide, and received interest in, additional working capital investment as part of the reorganization process.

25.    Second, the Debtor has also obtained interest from existing and potential customers in expanding the use of its products. For instance, after two and a half years in strategic and technical alliance with a major tribal entity, including co-financed product development activity, the Debtor is in the process of finalizing a joint venture with such tribal entity to place the Debtor's technologies in gaming establishments worldwide. The Debtor's intellectual property includes major claims for interactive gamification, including interactive and mobile casino-type betting. Further, the Debtor is planning on an aggressive go-to-market effort using the original seventy-one pilot locations around the country in health clubs, college fitness centers, and casinos from coast to coast, leading to an exponential growth in revenue. With the potential for a significant infusion of capital and an expansion of the Debtor's customer base, I, and other management, believe the Debtor can put forth a viable restructuring proposal in a chapter 11 plan.

26.    While the Debtor will seek to enhance the value of its business and provide the highest reorganization value to its creditors and investors, the Debtor must first address the Chapter 7 Case. The Debtor, concurrently with the filing of its chapter 11 petition before this Court, will seek to have the Chapter 7 Case dismissed or converted and transferred to this court for consolidation with this chapter 11 proceeding.

27.    I, in addition to the managers, board members, and certain investors and creditors of the Debtor, believe the Chapter 7 Case is a misguided litigation tactic by the Petitioners. As noted, shortly after receiving notice of the Debtor's appeal of the Judgment, the Petitioners (some of whom are former insiders of the Debtor) garnished the Debtor's bank

accounts and took all immediately available funds, causing a termination of funding on the Debtor's line of credit. When that did not stop the Debtor's appeal, the Petitioners filed the Chapter 7 Case and notified the Supreme Court of Nevada that the appeal must be stayed.

28.    I further believe the Petitioners hope to use the Chapter 7 Case as a means to obtain the Debtor's valuable intellectual property at liquidation value. Accordingly, I do not believe the Chapter 7 Case has merit and should be dismissed or converted and transferred to this proceeding.

29.    I also do not believe this chapter 11 proceeding will prejudice the Petitioners or other creditors and investors of the Debtor. After receiving advice from various professionals and legal counsel concerning a bankruptcy of the Debtor in general, the Debtor's board and management decided that the best path forward is to reorganize in this chapter 11 proceeding and not liquidate or simply seek a dismissal of the Chapter 7 Case. As for the Petitioners specifically, the Debtor will seek to resolve the Judgment either in the Nevada state courts or through negotiations with the Petitioners as part of the bankruptcy process. I believe reorganizing in this chapter 11 proceeding provides the most promise for creditors and investors of the Debtor to obtain the highest value on their claims and interests while protecting the entire creditor and investor body.

30.    I further believe that Delaware is an appropriate forum for the Debtor's reorganization. The Debtor is incorporated in Delaware and has creditors, customers, and investors throughout the nation. In addition, although the Debtor's management, operations, and assets are in Colorado, it is far easier and less time consuming to travel to Delaware (by flying out of Albuquerque, New Mexico) than it is to drive to Denver, Colorado, the location of the

Colorado bankruptcy court. Thus, I believe Delaware provides a reasonable venue for all parties in interest to protect their interests and advance the Debtor's reorganization.

        31.     Finally, I have been advised that although a debtor in possession can continue its business in chapter 11 (in certain respects), the debtor in possession in a chapter 11 case typically files various motions and applications (the "**First Day Motions**") with the bankruptcy court to smooth the transition into chapter 11. But because of the sudden filing of the Chapter 7 Case and the Petitioners' actions against the Debtor's bank accounts and available credit, the Debtor's efforts have been focused on obtaining the appropriate relief in the Chapter 7 Case and preserving its business with the Chapter 7 Case looming over its head. The Debtor therefore intends to file appropriate First Day Motions in the near term while attempting to resolve the Chapter 7 Case.

*[Remainder of the page intentionally left blank]*

## CONCLUSION

I declare under the penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated:  May 8, 2015

Respectfully submitted,

**Airborne Media Group, Inc.**

By:     Cordell R. Brown
Title: Chief Executive Officer

11